# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| **WEIRTON AREA WATER BOARD** and **CITY OF WEIRTON**, <br><br> Plaintiffs, <br><br> v. <br><br> **CORTEVA, INC., DUPONT DE NEMOURS, INC., AGC CHEMICALS AMERICAS, INC., ARCHROMA U.S., INC., DYNAX CORPORATION, SOLVAY SPECIALTY POLYMERS, USA, LLC, and SOLVAY USA, INC.** <br><br> Defendants. | **CIVIL ACTION NO.** |

**COMPLAINT**

Plaintiffs, the Weirton Area Water Board and the City of Weirton ("Plaintiffs"), by and through their undersigned attorneys, as and for their Complaint against the Defendants, Corteva, Inc., Dupont de Nemours, Inc., AGC Chemicals Americas, Inc., Archroma U.S., Inc. Dynax Corporation, Solvay Specialty Polymers, USA, LLC, and Solvay USA, Inc., allege and state as follows:

**NATURE OF THE ACTION AND PARTIES**

Plaintiffs:

1.      Plaintiff, The City of Weirton, is a municipal corporation duly organized and existing by virtue of the laws of the State of West Virginia, with its principal place of business in Weirton, West Virginia.

{00331334-1}

2.      Plaintiff, Weirton Area Water Board, is a governmental entity and/or an agency of the City of Weirton, with its principal place of business in Weirton, Brooke County, West Virginia.

3.      Plaintiffs own and operate a public water system that serves Weirton and the surrounding areas of West Virginia (the "Weirton Water System").

4.      The Weirton Water System consists of water sources, treatment facilities and related equipment, and water delivery systems, all located in Brooke and Hancock Counties, West Virginia.

5.      Plaintiffs are responsible for the supervision, management, control and operation of the Weirton Water System.

6.      Plaintiffs are required and/or are responsible to produce and deliver through the Weirton Water System to the residents of Brooke and Hancock Counties, West Virginia safe, clean and high-quality water that meets all applicable standards.

7.      Plaintiffs have owned and operated the Weirton Water System for more than seventy (70) years.

8.      The Weirton Water System currently serves more than nine thousand six hundred (9,600) customers, of which approximately eight thousand six hundred (8,600) are residential, six hundred fifty (650) are commercial, forty-five (45) are industrial and thirty (30) are public authorities.

9.      The Weirton Water System has been contaminated with per- and poly-fluoroalkyl substances ("PFAS"), including perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA").

2

10. PFOS and PFOA are fluorosurfactants that repel oil, grease, and water. They are manmade chemicals that were manufactured for use in various products and industrial applications.

11. Among other products, PFOS, PFOA, and/or their chemical precursors, were used in the manufacture of aqueous film-forming foam ("AFFF") AFFF products, which are firefighting suppressant agents used in training and firefighting activities for fighting Class B fires.

12. Class B fires include fires involving hydrocarbon fuels, such as petroleum or other flammable liquids.

13. PFAS are toxic and pose serious health risks to humans and animals.

14. Human exposure to PFAS is associated with an increased risk of immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, and other adverse health conditions.

15. Plaintiffs bring this action to recover their damages and costs incurred and to be incurred in investigating, monitoring, remediating, and otherwise responding to the contamination of the Weirton Water System with PFAS.

16. Plaintiffs should not have to bear these costs; they should be borne by the Defendants, who are responsible for the PFAS contamination.

Defendants:

17. Defendants, CORTEVA, INC., DUPONT DE NEMOURS, INC., AGC CHEMICALS AMERICAS, INC., ARCHROMA U.S., INC., DYNAX CORPORATION, SOLVAY SPECIALTY POLYMERS, USA, LLC, and SOLVAY USA, INC. ("Defendants") designed, developed, manufactured, marketed, and sold PFAS and/or products containing PFAS, including AFFF, throughout the United States, including in West Virginia.

3

18.     Defendants knew or should have known that, in the course of normal and/or anticipated transportation, storage, use and disposal of the above chemicals, they would enter the surface and groundwater in West Virginia, including the  Ohio River and the watershed from which Plaintiffs obtain their drinking water supplies.

19.     The term "Defendant" or "Defendants" refers collectively to all Defendants named herein jointly and severally.  The Defendants include any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint ventures, and organizational unities of any kind, their predecessors, successors, and assigns, and their present officers, directors, employees, agents, representatives, and any other person acting on their behalf.

20.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

21.     **Corteva, Inc.** ("Corteva") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 974 Centre Rd., Wilmington, Delaware 19805.

22.     **Dupont de Nemours Inc.** f/k/a DowDuPont, Inc. ("New DuPont") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674.

23.     On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva.

24. Corteva was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

25. On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a *pro rata* dividend. Following that distribution, Corteva became the direct parent of E. I. Du Pont de Nemours and Company.

26. Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

27. On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above described spin-offs, as well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva.

28. On information and belief, E.I. du Pont de Nemours and Company designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

29. As a major manufacturer and seller of these products,  E.I. du Pont de Nemours and Company was one of the participants in the PFOA Stewardship Program described below.

30. Upon information and belief, defendants Corteva and DuPont de Nemours, Inc. are responsible for the activities and liabilities of E.I. du Pont de Nemours and Company, including any corporate affiliate, predecessor and/or successor entity, as these relate to PFAS.

31. **Defendant AGC Chemicals Americas, Inc.** ("AGC") is a corporation organized and existing under the laws of Delaware, having its principal place of business at 55 East Uwchlan Avenue, Suite 201, Exton, PA 19341.

5

32. On information and belief, AGC Chemicals Americas, Inc. was formed in 2004 and is a subsidiary of AGC Inc., a foreign corporation organized under the laws of Japan, with its a principal place of business in Tokyo, Japan.

33. AGC manufactures specialty chemicals. It offers glass, electronic displays, and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

34. On information and belief, AGC designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

35. **Archroma U.S., Inc.** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 543577 Center Drive., Ste. 10, Charlotte, NC 28217-0750.

36. On information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management LLC, a foreign corporation based in Reinach, Switzerland.

37. Archroma U.S., Inc. is a successor in interest to Sandoz Chemical Corporation and to the textile chemicals, paper specialties and emulsions business of Clariant Corporation.

38. Archroma U.S., Inc. manufactures specialty chemicals, including for packaging and board, coated paper, dyes and pigments, adhesives, paints and other related products.

39. On information and belief, Archroma was formed in 2013, when Clariant Corporation divested its textile chemicals, paper specialties, and emulsions business to SK Capital Partners.

40. On information and belief, Archroma designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

41. Defendant **Dynax Corporation** ("Dynax") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523.

42. On information and belief, Dynax entered into the AFFF market on or about 1991 and quickly became a leading global producer of fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors.

43. On information and belief, Dynax designed, manufactured, marketed, distributed, and sold fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

44. Defendant **Solvay Specialty Polymers, USA, LLC** ("Solvay") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 4500 McGinnis Ferry Road, Alpharetta, GA 30005.

45. Solvay is a manufacturer and supplier of high-performance polymers for industrial users.   Upon information and belief, some of its products contain PFAS.

46. Defendant **Solvay USA Inc.**, ("Solvay USA") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 504 Carnegie Center, Princeton, NJ 08540.

47. One of Solvay USA's manufacturing facilities is located in West Virginia.

48. Solvay USA is a manufacturer and supplier of products sold to industrial users in many different markets and industries, such as agriculture, automotive and electronics.

7

49. Upon information and belief, at least one of Solvay USA's former product lines contained PFAS.

50. On information and belief, Solvay and Solvay USA are part of the Solvay Solexus corporate group ("Solvay Solexus").

51. As a major manufacturer and seller of these products, Solvay Solexus was one of the participants in the PFOA Stewardship Program described below.

52. On information and belief, Solvay Solexus' manufacturing facilities in New Jersey have been linked to PFAS contamination in groundwater in East Greenwich and West Deptford.

53. On information and belief, Solvay Solexus Solvay and Solvay USA designed, manufactured, marketed, distributed, and sold fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

54. Each of the Defendants knew or should have known that their operations would cause PFAS and/or products containing PFAS, including AFFF, to be discharged into the environment and inevitably contaminate surface water and groundwater drinking supplies, including within the Weirton Area watershed.

55. As a direct result of Defendants' tortious actions and omissions, the Weirton Water System has been contaminated with toxic PFAS chemicals.

## **JURISDICTION AND VENUE**

56. The Weirton Water System, which is the subject of this lawsuit, is located in Brooke County and Hancock County, West Virginia.

57. Plaintiffs originally commenced an action against these Defendants on April 19, 2020 in the Circuit Court of Brooke County of West Virginia.  Other defendants in that action

removed it to the District Court for the Northern District of West Virginia, Wheeling Division on the basis of diversity jurisdiction.

58.     By Order dated August 10, 2020, the Circuit Court of Brooke County of West Virginia denied Plaintiffs' motion to remand.

59.     By Order dated November 20, 2020 the U.S. District Court for Northern District of West Virginia dismissed the action against the Defendants herein for lack of personal jurisdiction.

60.     This Court has subject matter jurisdiction over the Defendants pursuant to 28 U.S.C. §1332(a)(1) and (d)(2) in that this action seeks monetary relief in excess of $75,000, exclusive of interest, costs and attorney's fees and is between citizens of different states.

61.     This Court has jurisdiction over Defendants as they are either Delaware corporations or subject to jurisdiction pursuant to 10 Del. C. §3104.

62.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because the Defendants are all incorporated in Delaware and are subject to personal jurisdiction in this District with respect to this action.

## FACTUAL ALLEGATIONS
### Contamination of The Weirton Water System

63.     The water sources that comprise part of the Weirton Water System are an intake on the Ohio River and the Ranney Well, a groundwater collector well on the bank of the Ohio River.

64.     Water from these water sources is combined and treated at the Weirton Water System's treatment plant located at 3031 Birch Drive, Brooke County, West Virginia.

65.     The water, intake pipe, collector well, treatment plant, and all associated piping, equipment and appurtenances are all part of the Weirton Water System.

66.     The Weirton watershed area consists of the Source Water Protection Area in and around its water system and the larger Zone of Critical Concern, which includes upland areas along the banks of the Ohio River and the river.

67.     On May 2, 2012 the United States Environmental Protection Agency ("EPA") published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), which required public water systems nationwide to monitor for thirty (30) contaminants of concern between 2013 and 2015. The UCMR3 Rule included the requirement that public water systems sample for six perfluorinated compounds, including PFOA.

68.     In May 2016, the EPA lowered its lifetime health advisory level from for PFOS from 200 parts per trillion ("ppt") and 400 ppt for PFOA to 70 ppt for PFOA and PFOS combined. See Lifetime Health Advisories and Health Effects Support Documents for PFOA and PFOS, 81 Fed. Reg. 33,250-51 (May 25, 2016).

69.     The EPA health advisory level was issued as a non-mandatory guideline.  However, on March 3, 2021, the agency issued its Final Determination to regulate the above chemicals under the  Safe Drinking Water Act Section 1412(b0(1)(A).[1]

70.     The State of West Virginia does not currently have a maximum contaminant level ("MCL") for PFAS.   A bill introduced in the West Virginia Legislature seeks to establish such MCLs.[2]

---

[1] https://www.federalregister.gov/documents/2021/03/03/2021-04184/announcement-of-final-regulatory-determinations-for-contaminants-on-the-fourth-drinking-water
[2] https://www.wvlegislature.gov/bill_status/bills_text.cfm?billdoc=HB4542%20INTR.htm&yr=2020&sesstype=RS&i=4542#

71.     In sampling conducted on June 8, 2018, PFAS were found for the first time at detectable levels in the Weirton Water System.  Of these, PFOS was detected at 8.9 ppt and PFOA at 3.8 ppt in the drinking water sample at the water treatment plant.

72.     In sampling conducted on March 27, 2019, PFAS chemicals were first detected at the Ranney well pump tap of groundwater, at levels of 5.2 ppt for PFOA and 21.0 ppt for PFOS. Various PFAS were also detected again at the lab sink at the water treatment plant, including at levels of 8.3 ppt for PFOS and 2.6 ppt for PFOA.

73.     On December 19, 2019, the EPA issued a Memorandum with Interim Recommendations stating "In situations where groundwater is currently being used for drinking water, EPA expects that responsible parties will address levels of PFOA and/or PFOS over 70 ppt."

74.     In view of the 2019 finding of PFAS in all water supply sources,  EPA's December 2019 interim guidance document, growing public concern about these toxic chemicals in the drinking water, and impending state and federal regulations, Plaintiffs have begun to take action to address the contamination of the Weirton Water System.

75.     Such action includes, but is not limited to planning, designing, purchasing and installing equipment to filter and treat the water to remove PFAS, infrastructure modifications, contingency planning, and testing and monitoring to ensure the Weirton Water System provides clean and safe water to residences and businesses.

**PFOA and PFOS and Their Risk to Public Health and the Environment**

76.     PFAS are chemical compounds containing fluorine and carbon. These substances have been used for decades in the manufacture of, among other things, household and commercial

11

products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

77. The two most widely studied types of these substances are PFOA and PFOS, which each contain eight carbon atoms.

78. PFOA and PFOS have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals.

79. PFOA and PFOS easily dissolve in water, and thus they are mobile and easily spread in the environment. PFOA and PFOS also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

80. PFOA and PFOS are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA and PFOS are thermally, chemically, and biologically stable. They resist degradation due to light, water, and biological processes.

81. Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

82. PFOA and PFOS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant

periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

83.     PFOA and PFOS biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFOA and/or PFOS.

84.     The chemical structure of PFOA and PFOS makes them resistant to breakdown or environmental degradation. As a result, they are persistent when released into the environment.

85.     Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, high uric acid, and high cholesterol. In laboratory testing on animals, PFOA and PFOS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

86.     The injuries caused by PFAS can arise months or years after exposure.

**Defendants' Manufacture, Sale and Use of PFAS Despite Known Risks**

87.     In the 1940's, 3M Company began using a process called electrochemical fluorination to create carbon-fluorine bonds, which are key components of PFAS.

88.     3M Company soon discovered that these types of substances have strong surfactant properties, meaning that they reduce the surface tension between a liquid and another liquid or solid. This reduced surface tension enabled 3M Company to develop a myriad of products that resist heat, stains, oil, and water. These products included older forms of Scotch Gard, which contained PFAS and when applied to fabric, furniture, and carpets protected against liquids and stains.

89.     Upon information and belief, by at least the 1970s, 3M Company knew or should have known that PFAS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

13

90.    In 1975, 3M Company concluded that PFOS was present in the blood of the general population. Since PFOS is not naturally occurring, this finding should have alerted 3M Company to the possibility that their products were a source of these chemicals. The finding also should have alerted 3M Company that PFOS is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics explain the absorption of PFOS in blood after contact with 3M's products.

91.    Upon information and belief, 3M Company concealed this knowledge from the public and government regulators its knowledge of the risk of harm posed by PFOS.

92.    In 1976, 3M Company found PFOA in the blood of its workers. This finding should have alerted 3M Company to the same issues raised by the findings regarding PFOS in the prior year.

93.    A 1978 study by 3M Company showed that PFOA reduced the survival rate of fathead minnow fish eggs. Other studies by 3M Company in 1978 showed that PFOS and PFOA are toxic to rats, and that PFOS is toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS.

94.    Studies by 3M Company after the 1970s also showed adverse effects from exposure to PFOA and PFOS. In a 1983 study, for example, 3M Company found that PFOS caused the growth of cancerous tumors in rats.

95.    A study proposal by 3M Company in 1983 stated that the resistance to degradation of PFOA and PFOS made them "potential candidates for environmental regulations, including further testing requirements under laws such as the Toxic Substances Control Act." 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals - Phase II, at p.6 (E. A. Reiner, ed. May 20, 1983).

14

96.     In or around 1998, EPA began investigating the safety of PFAS after some limited disclosures by 3M Company and others.

97.     Federal law requires chemical manufacturers and distributors to immediately notify the United States Environmental Protection Agency ("EPA") if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e).

98.     DuPont did not comply with its duty under TSCA and the Resource Conservation and Recovery Act (RCRA), and, in 2005, agreed to pay $10.25 million, the largest civil administrative penalty that EPA had ever obtained to that date under any federal statute. The TSCA violations of Section 8(e) specifically addressed the company's failure to report to EPA the substantial risks of PFAS, of which DuPont was aware.

99.     In 2005, the U.S. Department of Health and Human Services found that "human exposure to PFOA and PFOS lead to the buildup of these chemicals in the body."

100.    All of the Defendants manufactured, distributed, sold and promoted PFAS and products containing PFAS of various kinds and in various quantities.

101.    In 2006, eight major PFOA manufacturers, including many of the Defendants or their predecessors, including Clariant, Dupont, and Solvay Solexis, agreed to participate in the EPA's PFOA Stewardship Program. The participating companies made voluntary commitments to reduce product content and facility emissions of toxic PFOA and related chemicals by 95% no later than 2010.

102.    The recommendations in the EPA's health advisories evolved as they learned more about the dangers and toxicity of PFAS.

103.    On January 8, 2009, the EPA issued Provisional Health Advisories for PFOA and PFOS, advising that "action should be taken to reduce exposure" to drinking water containing levels of PFOA and PFOS exceeding 400 ppt and 200 ppt, respectively.

104.    Many parties have studied PFOA, also known as C8, including a Science Panel formed out of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

105.    The C8 panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

106.    Even after the C8 Science Panel publicly announced that human exposure to 50 parts per trillion, or more, of PFOA in drinking water for one year or longer had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFOA in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

107.    Furthermore, Defendants have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate to satisfy the standards of Defendants to prove such adverse effects upon and/or any risk to humans with respect to PFOA in human blood.

16

108.    At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing the public from discovering the existence and extent of any injuries/harm as alleged herein.

109.    At all relevant times, each of the Defendants knew, or should have known, that PFAS and products containing PFAS create a substantial risk of harm to public water supplies, including Plaintiffs' drinking water supply.

110.    Upon information and belief, each of the Defendants is responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiffs, as alleged, either through each Defendant's own conduct or through the conduct of its agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

### Defendants' Manufacture and Sale of AFFF/Component Products

111.    AFFF is a type of water-based foam that was first developed in the 1960s to extinguish hydrocarbon fuel-based fires.

112.    AFFF is a Class-B firefighting foam. It is mixed with water and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

113.    AFFF is synthetically formed by combining fluorine-free hydrocarbon foaming agents with fluorosurfactants.  When mixed with water, the resulting solution produces an aqueous

film that spreads across the surface of hydrocarbon fuel.  This film provides fire extinguishment and is the source of the designation aqueous film-forming foam.

114.    Beginning in the 1960s, the Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products that used fluorosurfactants containing either PFOS, PFOA, or the chemical precursors that degrade into PFOS and PFOA.

115.    AFFF can be made without the fluorosurfactants that contain PFOA, PFOS, and/or their precursor chemicals.  Fluorine-free firefighting foams, for instance, do not release PFOA, PFOS, and/or their precursor chemicals into the environment.

116.    AFFF that contains fluorosurfactants, however, is better at extinguishing hydrocarbon fuel-based fires due to their surface-tension lowering properties, essentially smothering the fire and starving it of oxygen.

117.    On information and belief, the Defendants designed, manufactured, marketed, distributed, and/or sold PFAS and/or products containing PFAS, including AFFF, which were discharged into the environment in and around Weirton, West Virginia during fire protection, training, and response activities, resulting in widespread PFAS contamination.

118.    On information and belief, Defendants' AFFF was purchased and used by various industrial facilities in and around Weirton, West Virginia, including at the Weirton Steel facility, currently operated by ArcelorMittal, and at Ball Corp.

**PFAS is Fungible and Commingled in the Groundwater**

119.    Once they are released to the environment and groundwater, PFAS lack characteristics that would enable identification of the company that manufactured the particular batch of chemicals or products that contained the PFAS.

18

120.    The process of manufacture and distribution of PFAS and PFAS-containing products, including AFFF, sometimes includes complex arrangements whereby Defendants sell their chemicals or products through intermediaries.

121.    Surface waters, including the Ohio River, contain PFAS which originates from many different sources.

122.    Similarly, subsurface contamination of groundwater with PFAS can be caused by a variety of sources and facilities, including PFAS chemicals coming from different manufacturers.

123.    Because precise identification of the specific manufacturer or source of PFAS that may be detected in surface and/or groundwater is impossible, Plaintiffs must pursue all Defendants, jointly and severally, for those indivisible injuries which Defendants have collectively visited upon the Weirton Water System.

124.    Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFAS from the public, including Plaintiffs, and to attempt to avoid liability for their contamination of drinking water supplies.

### FIRST CAUSE OF ACTION:
### <u>PRODUCT LIABILITY FOR DEFECTIVE DESIGN</u>

125.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

126.    As commercial designers, manufacturers, distributors, suppliers, sellers, and/or marketers of PFAS and/or products containing PFAS, including AFFF, Defendants had a strict duty not to place into the stream of commerce a product that is unreasonably dangerous.

127.    Defendants knew that third parties would purchase PFAS and/or products containing PFAS, including AFFF and use them without inspection for defects.

128. PFAS and/or products containing PFAS, including AFFF, designed, sold and distributed by the Defendants were applied, discharged, disposed of, or otherwise released onto lands and/or water in the vicinity of the Weirton Water System, including in the Ohio River and the Weirton Area watershed.

129. PFAS and/or products containing PFAS, including AFFF, designed, sold and distributed by the Defendants, were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

130. Defendants knew or reasonably should have known that the use of PFAS and/or products containing PFAS, including AFFF, in their intended manner would result in the spillage, discharge, disposal, or release of PFAS onto land or into water.

131. PFAS and/or products containing PFAS, including AFFF, used in the vicinity of the Weirton Water System were defective in design and unreasonably dangerous for their intended use because, among other things:

a. PFAS cause extensive and persistent surface and groundwater contamination when these chemicals, or products containing them, are used and discharged in their foreseeable and intended manner.

b. PFAS contamination in drinking water poses significant threats to public health and welfare.

c. Defendants failed to conduct and/or failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFAS.

d. There are and were safe or safer alternatives to PFAS and AFFF which Defendants could and should have employed.

20

132. At all times relevant to this action, products containing PFAS, including AFFF, were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

133. At all times relevant to this action, the foreseeable risk of harm to public health and welfare posed by PFAS outweighed the cost to Defendants of reducing or eliminating such risk.

134. At all times relevant to this action, a reasonably prudent manufacturer knew or should have known of the significant dangers posed by PFAS.

135. Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS and/or products containing PFAS, including AFFF, in conscious disregard of the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare.

136. As direct and proximate result of Defendants' defective and unsafe PFAS and/or products containing PFAS, including AFFF, significant PFAS contamination and damage to the Weirton Water System has occurred and will continue to occur in the future for years to come, causing the Plaintiffs to incur significant damage and injury.

137. Defendants are jointly and severally liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

138. As a direct result of the foregoing, Plaintiffs seeks compensatory damages in an amount to be determined by a jury at the time of trial.

## SECOND CAUSE OF ACTION:
## PRODUCT LIABILITY FOR FAILURE TO WARN

139. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

21

140.    As designers, manufacturers, distributors, sellers, suppliers, and/or marketers of PFAS and/or products containing PFAS, including AFFF, Defendants had a strict duty to warn against latent dangers resulting from foreseeable uses of their products that Defendants knew or should have known about.

141.    Defendants knew that third parties would purchase PFAS and/or products containing PFAS, including AFFF, and use them without inspection for defects.

142.    PFAS and/or products containing PFAS, including AFFF, designed, sold and distributed by the Defendants were applied, discharged, disposed of, or otherwise released at various locations, at various times, and in various amounts onto the lands and/or water in the vicinity of the Weirton Water System, including the Ohio River and the Source Water Protection Area for Weirton.

143.    PFAS and/or products containing PFAS designed, sold and distributed by the Defendants were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

144.    Defendants knew or should have known that the use of PFAS and/or products containing PFAS, including AFFF, in their intended manner would result in the discharge, disposal, or release of PFAS onto land or into water.

145.    PFAS and/or products containing PFAS, including AFFF, used in the vicinity of the Weirton Area watershed and the Weirton Water System were defective in design and had a use defect and were unreasonably dangerous products for the reasons set forth above.

146.    Despite the known and/or reasonably foreseeable hazards to human health and welfare associated with the use of PFAS and/or products containing PFAS products, including

AFFF, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate those hazards.

147.    In particular, Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their PFAS and/or products containing PFAS, including AFFF, that now contaminate the Weirton Water System.

148.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, significant PFAS contamination and damage to the Weirton Water System has occurred and will continue to occur in the future for years to come, causing the Plaintiffs to incur significant damage and injury.

149.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of the Weirton Water System.

150.    At all times relevant to this action, a reasonably prudent manufacturer would or should have warned purchasers and users of the significant dangers posed by PFAS.

151.    Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice.  Such conduct was performed to promote sales of PFAS and/or products containing PFAS, including AFFF, in conscious disregard of the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare.

152.    Defendants are jointly and severally liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

153.    As a direct result of the foregoing, Plaintiffs seeks compensatory damages in an amount to be determined by a jury at the time of trial.

## THIRD CAUSE OF ACTION:
## PUBLIC NUISANCE

154.     Plaintiffs reallege and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

155.     The Weirton Water System provide drinking water to a large number of residents and businesses for drinking, bathing, cleaning, washing, and other uses.

156.     Members of the public have a right to have their water remain clean and potable, free of contamination by toxic man-made compounds.

157.     Defendants have designed, manufactured, formulated, marketed, promoted distributed, sold, supplied, used and/or discharged PFAS and/or products containing PFAS, including AFFF, in a manner that has created a public nuisance and that unreasonably endangers or injures the property, health, safety and comfort of the general public, causing injury, inconvenience and annoyance.

158.     Defendants, by their negligent, reckless and willful acts and omissions set forth above, have caused significant, long-lasting, and ongoing contamination of the Weirton Water System and the surrounding water supply.

159.     By their conduct, Defendants violated and/or endangered the public right to pure drinking water as well as a clean and unpolluted natural environment, including reserves of unpolluted surface and groundwater.

160.     Defendants' conduct has also injured the property, health, safety and/or comfort of a considerable number of persons.

161.     Defendants have taken no action to abate or remediate the nuisance.

162. The harm or endangerment to the public health, safety and the environment is ongoing and will continue as long as PFAS chemicals remain at detectable levels in the Weirton Water System and until appropriate measures are put in place to remove these contaminants.

163. As owners of the Weirton Water System and purveyors of drinking water, Plaintiffs have the obligation and responsibility to address the contamination caused by Defendants to the Weirton Water System.

164. Pursuant to West Virginia Code Section 8-12-5, Plaintiff, the City of Weirton, has the authority to bring this action to abate the public nuisance caused by the contamination of the Weirton Water System.

165. Plaintiffs have incurred and/or will incur special injuries and/or injuries that are different in kind from those incurred by the general public in connection with the aforesaid contamination including: investigative costs, additional testing costs, treatment costs, infrastructure costs, contingency planning, and loss of consumer confidence arising out of the increasingly widespread public perception - based on actual fact - that the Weirton Water System has been rendered less certain, safe and reliable.

166. Plaintiffs also have and will continue to incur attorney fees related to cost recovery efforts and/or potential third-party liability.

167. Defendants knew or, in the exercise of reasonable care, should have known that their acts and omissions, described above, would and have unreasonably and seriously damage, endanger, and interfere with the ordinary comfort, use and enjoyment of vital surface and groundwater resources utilized by Plaintiffs and relied upon by the public.

168. As a direct and proximate result of Defendants' acts and omissions which created the above-described nuisance, the public has suffered annoyance, inconvenience and injury, and

Plaintiffs have suffered special injuries different in kind than those of the public from actual and continuing contamination of the Weirton Water System.

169. The gravity of the environmental and human health risks created by Defendants' conduct and Defendants' concealment of the dangers to human health and the environment far outweigh any social utility of Defendants' conduct.

170. Defendants are jointly and severally liable and subject to injunctive relief prohibiting the creation and continuation of said nuisance, and Plaintiffs are entitled to abate the nuisance and all direct and consequential damages as described herein.

171. Defendants also are liable for any other relief that will abate the nuisance and its short-term and long-term effects.

**FOURTH CAUSE OF ACTION:**
**<u>NEGLIGENCE</u>**

172. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

173. Defendants owed Plaintiffs a cognizable duty to exercise reasonable care in designing, formulating, manufacturing, distributing, selling, supplying, and/or marketing unreasonably dangerous chemicals such as PFAS and/or products containing PFAS, including AFFF.

174. Defendants breached this duty by negligently putting PFAS into the stream of commerce, including in and around the Weirton Area watershed, even when they knew or should have known about the dangers PFAS posed to water.

175. Defendants had a duty to adequately and timely warn federal, state, and local regulators and authorities, Plaintiffs, and the public, of the presence of and threats posed by releases of PFAS into the environment and, especially, its presence in water.

26

176.     Defendants also had an affirmative duty to remove and remediate the PFAS contamination from surface water and groundwater, including in the Weirton Water System and Weirton Area watershed in the vicinity of the Weirton Water System.

177.     Defendants breached each of these duties and failed to provide any warnings or take any action to prevent, mitigate or abate the harm caused by their products.

178.     Defendants' past and continuing breach of their duties is the direct, sole and proximate cause of substantial and continuing harm to Plaintiffs and the Weirton Water System and of Plaintiffs' damages.

179.     Plaintiffs' damages were reasonably foreseeable as resulting from Defendants' tortious conduct and omissions, as described above.

180.     Defendants are jointly and severally liable for all such damages.

181.     As a direct result of the foregoing, Plaintiffs seek compensatory damages in an amount to be determined by a jury at the time of trial.

**FIFTH CAUSE OF ACTION:**
**PRIMA FACIE NEGLIGENCE - NEGLIGENCE PER SE**

182.     Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

183.     Defendants owed a duty to Plaintiffs to conduct their business in a manner that would not violate applicable legal requirements, including West Virginia's Water Pollution Control Act, West Virginia Code §22-11-1 *et seq.,* West Virginia's Groundwater Protection Act, W.Va. Code§ 22-12-1 *et seq.*, West Virginia's Solid Waste Management Act, W.Va. Code §§ 22-15-1 *et seq.*

184.     The above statutes are intended to protect the health, safety and welfare of the public, protect West Virginia's natural resources, including surface and groundwater and soil, and maintain reasonable standards of purity and quality of these resources.

185.     Plaintiffs and the residents of Weirton, who rely on its water system, are protected by the above statutes.

186.      Defendants' acts and omissions described above have caused and continue to cause past, present, and continuing violations of the above statutes and constitute negligence per se and/or prima facie negligence.

187.     As a direct proximate result of Defendants' statutory violations and negligent, wanton, and reckless acts or omissions, as described above, the Weirton Water System has been contaminated by PFAS, and Plaintiffs have suffered and will continue to suffer damages as described herein.

188.     Defendants are jointly and severally liable for all such damages.

189.     As a direct result of the foregoing, Plaintiffs seek compensatory damages in an amount to be determined by a jury at the time of trial.

## SIXTH CAUSE OF ACTION:
### TRESPASS

190.     Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

191.     Plaintiffs own and possess the Weirton Water System, and Plaintiffs exercise their rights to appropriate and use water within the Weirton Water System, including the Ranney Well and water drawn from its intake on the Ohio River.

192.     Plaintiffs did not give any Defendant permission to cause PFAS to enter the Weirton Water System.

28

193.     Defendants knew or reasonably have known that PFAS have a propensity to migrate in surface and groundwater aquifers when released to the environment; are mobile and persistent groundwater contaminant capable of moving substantial distances within aquifers; are toxic to human health; and are, therefore, hazardous to drinking water systems and human health.

194.     Defendants intentionally manufactured, promoted, marketed, distributed, sold, stored, used and/or discharged PFAS and/or products containing PFAS, including AFFF.

195.     Defendants knew or reasonably should have known that their actions would result in the discharge and release of PFAS into the environment, including within the Weirton watershed, and that these chemicals would intrude upon, contaminate, and damage the Weirton Water System.

196.     Defendants' actions and omissions were intentional and/or were done with reckless disregard to Plaintiffs' possessory interests.

197.     Defendants' tortious conduct constitutes a continuing, unauthorized intrusion and a continuing trespass onto the Weirton Water System, causing past, present and future damages to Plaintiffs.

198.     Defendants' actions were voluntary and were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiffs and Plaintiffs' customers' rights, health and property.

199.     Each Defendant is a substantial factor in bringing about the contamination of Plaintiffs' Water System, and each Defendant aided and abetted the trespasses.

200.     Defendants are jointly and severally liable for all of Plaintiffs' damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

201.    As a direct result of the foregoing, Plaintiffs seek compensatory damages in a sum to be determined by a jury at the time of trial.

**PUNITIVE DAMAGES**

202.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully stated herein.

203.    At all times relevant to the present cause of action, Defendants designed, manufactured, marketed, sold, stored, used, and/or discharged PFAS and/or products containing PFAS, including AFFF, that resulted in the contamination of the Weirton Water System.

204.    At the time the above-described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants had good reason to know or expect that large quantities of PFAS would and/or could be introduced into the environment, surface water, and/or groundwater causing contamination of the Weirton Water System.

205.    Defendants caused an unknown quantity of PFAS to be released into the environment, surface water, soil, and/or groundwater, threatening and impacting the Weirton Water System.

206.    The Defendants actions which were intentional, willful, wanton and done with actual malice, include but are not limited to, failing to issue warnings and failing to divulge material information concerning the harm caused by PFAS in the environment and human health, especially in water, despite knowing of the probability of long-lasting water contamination, including specifically high risks to aquifers and groundwater posed by PFAS and/or products containing PFAS, including AFFF.

207.    Defendants' intentional, willful, wanton, malicious, and/or reckless conduct includes, but is not limited to, Defendants' failure to take all reasonable measures to ensure that

30

PFAS would be effectively disposed of and not discharged into the surrounding environment where it would inevitably contaminate water, including the Weirton Water System.

208. Defendants have caused great harm to Plaintiffs, who have incurred and will continue to incur costs in responding to the contamination from PFAS and will incur future costs, including but not limited to, investigative costs, engineering costs, treatment costs, sampling and monitoring costs, and legal costs.

209. Defendants have demonstrated an outrageous conscious disregard for the environment and acted with implied malice and oppression, warranting the imposition of punitive damages.

210. Furthermore, Defendants acted in the foregoing manner with conscious disregard for the safety and rights of Plaintiffs and residents of Brooke and Hancock Counties and their natural resources, which actions had a great probability of causing substantial and continuing harm.

211. The releases of PFOA were the result of intentional, willful and/or malicious conduct within the privity and/or knowledge of Defendants, and were caused, among other things, by Defendants' violations of applicable environmental, safety or operating standards, regulations or laws.

212. As a direct and proximate result of Defendants' intentional, willful and malicious conduct, Plaintiffs are entitled to recover punitive damages.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs, City of Weirton and Weirton Area Water Board, pray for judgment against the Defendants, jointly and severally, as follows:

(A) All compensatory damages allowed by law and in an amount to be determined by a jury;

(B) Damages for injury to Weirton's natural resources, including the economic impact to the Plaintiffs and Weirton area residents;

31

(C)     An award of all present and future costs to treat and/or abate the existing and future PFAS contamination complained of herein;

(D)     A declaration of Defendants' duty to indemnify Plaintiffs for all expenditures of money that they reasonably undertake in connection with the PFAS contamination;

(E)     Punitive damages;

(F)     Pre-judgment and post-judgment interest as provided under the law;

(G)     Costs and attorney fees expended in the prosecution of this matter, if permitted;

(H)     All such other relief as the Court may deem just, proper and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury of any and all issues in this matter so triable pursuant to Federal Rule of Civil Procedure 38(b).

Dated: March 5, 2021

Respectfully submitted,

*NAPOLI SHKOLNIK, PLLC*
*Attorneys for Plaintiffs,*
*WEIRTON AREA WATER BOARD*
*AND THE CITY OF WEIRTON*

By: */s/ R. Joseph Hrubiec*
 R. Joseph Hrubiec (DE ID No. 5500)
 919 North Market Street
 Suite 1801
 Wilmington, DE 19801
 (302) 330-8025
 rhrubiec@napolilaw.com

 Andrew Croner (*pro hac vice forthcoming*)
 360 Lexington Avenue, 11th Floor
 New York, NY 10017
 (212) 397-1000
 acroner@napolilaw.com

32

33

Paul Napoli  (*pro hac vice forthcoming*)
270 Munoz Rivera Avenue, Suite 201
Hato Rey, Puerto Rico 00918
(787) 493-5088
pnapoli@nsprlaw.com

Lilia Factor (*pro hac vice forthcoming*)
400 Broadhollow Rd., Ste. 305
Melville, NY 11747
(212) 397-1000
lfactor@napolilaw.com

JS 44   (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Weirton Area Water Board and City of Weirton

## DEFENDANTS

Corteva, Inc. Dupont de Nemours, Inc., AGC Chemicals Americas, Inc., Archroma U.S., Inc., Dynax Corporation, Solvay Specialty Polymers, USA, LLC and Solvay USA, Inc.

**(b)** County of Residence of First Listed Plaintiff    Brooke Cty., W.V.
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    New Castle Cty., DE
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Napoli Shkolnik, LLC
919 N. Market Street, Suite 1801
Wilmington, DE 19801    (302) 330-8025

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1   U.S. Government Plaintiff
- ❏ 2   U.S. Government Defendant
- ❏ 3   Federal Question *(U.S. Government Not a Party)*
- ☒ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 690 Other | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & | **PERSONAL INJURY** ❏ 365 Personal Injury - Product Liability | | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | ❏ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **PROPERTY RIGHTS** | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' Liability | ❏ 368 Asbestos Personal Injury Product Liability | ❏ 820 Copyrights | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 340 Marine ❏ 345 Marine Product Liability | **PERSONAL PROPERTY** | ❏ 830 Patent ❏ 835 Patent - Abbreviated New Drug Application ❏ 840 Trademark | ❏ 460 Deportation ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | **LABOR** | ❏ 480 Consumer Credit (15 USC 1681 or 1692) |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 371 Truth in Lending ❏ 380 Other Personal | ❏ 710 Fair Labor Standards Act | **SOCIAL SECURITY** ❏ 861 HIA (1395ff) |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | Property Damage | ❏ 720 Labor/Management Relations | ❏ 862 Black Lung (923) |
| ❏ 195 Contract Product Liability | ❏ 362 Personal Injury - Medical Malpractice | ☒ 385 Property Damage Product Liability | ❏ 740 Railway Labor Act ❏ 751 Family and Medical Leave Act | ❏ 863 DIWC/DIWW (405(g)) ❏ 864 SSID Title XVI |
| ❏ 196 Franchise | | | | ❏ 865 RSI (405(g)) |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 790 Other Labor Litigation | ❏ 485 Telephone Consumer Protection Act ❏ 490 Cable/Sat TV ❏ 850 Securities/Commodities/ Exchange |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | ❏ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** ❏ 870 Taxes (U.S. Plaintiff or Defendant) |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 890 Other Statutory Actions |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | ❏ 891 Agricultural Acts |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 893 Environmental Matters |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | | ❏ 895 Freedom of Information Act |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** ❏ 540 Mandamus & Other | **IMMIGRATION** ❏ 462 Naturalization Application | ❏ 896 Arbitration |
| | ❏ 448 Education | ❏ 550 Civil Rights ❏ 555 Prison Condition ❏ 560 Civil Detainee - Conditions of Confinement | ❏ 465 Other Immigration Actions | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision ❏ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ❏ 2   Removed from State Court
- ❏ 3   Remanded from Appellate Court
- ❏ 4   Reinstated or Reopened
- ❏ 5   Transferred from Another District *(specify)*
- ❏ 6   Multidistrict Litigation - Transfer
- ❏ 8   Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §1332(a)(1) and (d)(2); 28 U.S.C. §1391

Brief description of cause:
product liability, public nuisance, negligence, prima facie negligence, trespass

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes    ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE    The Honorable Richard Mark Gergel    DOCKET NUMBER    MDL No. 2:18-mn-2873

DATE
03/05/2021

SIGNATURE OF ATTORNEY OF RECORD
R. Joseph Hrubiec

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**   **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**   **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.**  Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.**  Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

Dated: October 6, 2025

Respectfully Submitted,

*/s/ Travis L. Brannon*
Travis L. Brannon (WVSB # 12504)
K&L Gates LLP
K&L Gates Center 210 Sixth Avenue
Pittsburgh, PA 15222
Tel: (412) 355-7443
travis.brannon@klgates.com

Cy A. Hill, Jr. (WVSB #8816)
Jennifer A. Lynch  (WVSB #12140)
Eric T. Frye (WVSB #10770)
Cipriani & Werner PC
Laidley Tower
500 Lee Street East Suite 900
Charleston, WV 25301
Tel: (304) 341-0500
Fax: (304) 341-0507
Chill@c-Wlaw.Com
Jlynch@c-Wlaw.Com
Efrye@c-Wlaw.Com

*Counsel for Heritage Thermal Services, Inc.*
*n/k/a Arcwood Environmental – East*
*Liverpool, Inc. and Heritage Transport LLC,*
*n/k/a Arcwood Transport, LLC*